It's okay, it'll be alright.  Good call. Good call. Very good. Yep effect. Our second case for the morning is the United States versus Allen, Mr. Inman. Good morning, Your Honor. Next case of court, counsel. Your Honor, this is an appeal from the denial of a motion to dismiss the indictment based on the Speedy Trial Act and the Sixth Amendment. I was appointed to represent Mr. Allen in February of 2014 in the District Court with Judge Walton Pratt, but Mr. Allen had been under indictment since September of 2010. The chronology, very briefly, is that he was in the Jefferson County, Kentucky jail, which is in Louisville, Kentucky, right across the river from Jeffersonville, Indiana and New Jurisdictions that play into this. He had been arrested on burglary and robbery charges in the Commonwealth of Kentucky and was sitting in the Jefferson County Jail. He'd been under investigation by the United States Attorney's Office at that point. They filed an indictment in September 2010. He was served that indictment in the Jefferson County Jail, but he was never brought to court. There was a superseding indictment December of 2010. He was also served that in the Jefferson County Jail, but he was never brought to court. The docket... Excuse me, counsel. I've either forgotten or didn't know in the first place. Where are federal in-custody prisoners held if they're being tried in New Albany? Three places, mainly Floyd County. We're all over the place. Floyd County, which is New Albany. And then two jails in Kentucky, but not the Jefferson County Jail. Not Jefferson? No, sir. Two other. Henderson, Kentucky and Grayson, Kentucky. Henderson County and Grayson. So it's not that... No, sir. It's not involved in this case. That's correct. He was not there... He was there under the auspices of the Commonwealth of Kentucky. So... Thank you. He also had a detainer on him from Clark County, which is Jeffersonville. He had a probation violation. He actually escaped from home detention. But in the district court, proceedings are held with his name on the docket, and if you review the public docket for Mr. Allen, there are various docket entries. They're noted in the brief. There was a pretrial held May 27th, I believe, of 2011, which shows his name as being a participant. That never happened. It also shows an individual named Joseph Cousins as being a participant. That never happened. So at this point, the case has been going on for several months. He has no counsel. He's not had an initial hearing. In October of 2011, which is docket entry 809, October 12th, 2011, the court makes an entry that vacates the dates as to Allen and Cousins because he hadn't been brought before the court. But that was over a year since the original indictment. That reeks of a phone call from the government telling the court that they'd messed up and they hadn't gotten Allen in front of anybody. In the meantime, here's what's happening, and I want to take you to the Barker v. Wingo analysis because I think this is the most important thing. This is really what this case is about. There's four prongs in the Barker v. Wingo case, and I know you all have seen that, you're familiar with it. Length of delay was 40 months, so that triggers further inquiry. Reason for delay and the blame on the government, obviously, Allen shoulders quite a bit of the reason for delay because he got arrested in other jurisdictions. But the government also knew where he was and could have brought him before the court. He did not assert his speedy trial rights the way that he should have over the course of that time, and the government has put in their brief that they find it questionable that after I got appointed to represent him, I continued the case five times and never asserted the speedy trial rights. But the point is, by the time I got the case, there wasn't anything I could do for him compared to what I could have done for him if I had been appointed back in September of 2010, which goes to the fourth prong of Barker v. Wingo. Prejudice to the defendant, there's three prongs of that. One is to prevent pretrial detention, obviously we couldn't do that, he was going to be detained. Two is to minimize anxiety on part of the defendant. Mr. Allen has a record, he was not anxious being in jail, I can't tell you that either. But the third thing is the impairment of defense, and it goes to re-evaluating what defending a federal case is all about. The idea that every federal case that I get, I'm going to do everything I can to get ready for trial from the get-go, just ignores what a good federal criminal defense attorney ought to be doing, which is knocking on the process, in a multi-defendant drug case, the pragmatic way to do it and the most effective way to do it is to start negotiating. You get a 5K1, you get a round mandatory minimum, you get your foot in the door, it's what I call the Hoosier hog theory of justice, which is the first hog to the trough gets the choice of slot, no matter what size the hog, and that's what happened here. Jesse Bottoms, who was the main defendant, along with a guy named Nelson, were the first two people that got their foot in the door, and they both were able to work out deals fairly readily and fairly quickly, where Nelson got 120 months, he was the supplier of the And then Bottoms would come up and get it along with a couple other people, take it down to southern Indiana, and then he would distribute it to three or four people, including Allen. So Allen was the third rung on the distribution chain. And out of 20 defendants, four of them got probation, three of them received sentences under 12 months. The deals that were available in this case, having practiced in the southern district for over, since before the guidelines, the deals that were available in this case were amazing. And Allen never had an opportunity to do that. I never had an opportunity to help him do that. And that's how you defend most federal drug cases. So if Barker v. Wingo, if impairment of defense is truly what, in this world, in this day and age, what a defense is worth, then I think you need to expand that definition and that prong of Barker v. Wingo, and that's really what this appeal is about. Did he have counsel fairly quickly after? No, and he had, Judge, in Kentucky, he had retained counsel at some point during the pendency of that proceeding, but that proceeding wasn't done, wasn't finished until May of 12. He was sentenced May of 12. But all it would have taken is, I mean, he could have, if you let him out the door of an hour, and they could have brought him over. The government brings people on temporary custody all the time for things like testifying. The idea that there had to be a writ, and that he had to transfer jurisdictions. Are you working with two different Marshals Service offices, one in Kentucky, one in Indiana? No. No, because he was, it would have been the Southern District Marshals Office. So, you know, a 15-minute hearing where he had been appointed counsel and then counsel could have worked together to work out some sort of package deal, if that's what you want to call it. He lost the ability to have these sentences run concurrent as opposed to consecutive because of the timing. He ended up representing himself to a fault in that he filed an interstate request for a detainer to get to Jeffersonville, to Clark County, as opposed to wait, any counsel would have made sure that he got into federal jurisdiction as soon as he was done with Kentucky, so my time is up. But I ask the court to review that Barker v. Wingo impairment of defense in light of truly what a federal criminal defense case is all about. Thank you. Thank you, Mr. Randolph. Mr. Reitz. May it please the court, Brian Reitz for the government. I would like to focus on the lack of prejudice here. Alan's prejudice argument under Barker v. Wingo fails for three main reasons. One, it was caused by his own criminality. Two, his arguments really go to the passage of time as opposed to the impairment of the defense function. And three, they fail on their own merits. I would like to focus on that quickly. The argument about the benefits that could have been received, well, the district court found that he already received a greatly beneficial plea deal. The government offered him a plea deal as if he would have been the first cooperator, so I don't think there's any actual prejudice on that point. The reason Alan's sentence was worse, as the district court noted, was because his criminal history was so egregious, including here we have a situation where when he was out on work release in Indiana, he's escaping from that, he's committing robbery, he's shooting someone in Kentucky while also undergoing this conspiracy to deal in cocaine. As to the concurrent sentences, I would point this court to the sentencing transcript on page 52 and 56 to 58 where the district court rejected that. The district court said even if I had the ability to sentence concurrently at the time, I would not do so because I think we were already at the bottom level of where a sentence would have been reasonable at 120 months. The district court would have been uncomfortable and essentially rejected that as being a possibility or something that she would have considered. And then moving on to the other, the second and third Barker v. Wingo factors, I think a big reason for the delay was his own criminality. This is a classic case of competing jurisdictions with competing claims. He had criminal cases in Indiana, Kentucky, and in federal court. Finally this assertion of right, he never asserted his right, despite while he was in Kentucky prison filing pro se, filing the detainer to get to Indiana. So we knew he has the capability, the knowledge to do that. And as soon as counsel was appointed, he filed five motions for continuances. So really, outside of the length of the delay, the last three Barker v. Wingo factors against Allen. And for that reason, if there are no questions, this court should affirm the district court. Well, I just want to go back, if I could, a second to your comment that the plea that was offered to him was in line with the others who pled originally. I just want to make sure I understand that. No, well the district court said it was greatly beneficial. Now, there was another defendant that got 120 months, and then Bottoms got 168 months. So Allen was at the top range of that, but the district court covered this. The reason he was at the top range is because he's a career offender, he has this egregious criminal history. So that, his past, put him at the top range of that, as opposed to anything with the passage of time. Moreover, the government granted him cooperating agreements. He got a three-level reduction for acceptance of responsibility for cooperating, even though there was essentially no one to cooperate with. So he really already received the benefit of that, as if he would have been first. It was just his criminal history that pushed him up to the 120 months. And even at that, the district court thought that was at the very low threshold of what would have been reasonable. I think if the government would have came with much less than 120 months, the district court would have rejected it. So I don't think the sentence really can show any sort of prejudice, because he received what the district court called a greatly beneficial plea deal. Do the others who received the sentences in that range, did they plead right away in this case? They pleaded. I think pretty much everybody pleaded pretty quickly. I don't exactly know the timing when the second person, Bottoms, I think, pleaded pretty quickly. But again, this is, I mean, Allen received a sentence within the top range of the criminals that were, and Allen was the son-in-law, essentially, of Bottoms, so he was closely connected to the top, plus his criminal history is what pushed him to the top of the sentencing range among the conspirators. This court should have, from the district court. Thank you. All right. Mr. Inman? Your Honor, I have no rebuttal. I can answer any questions. I just, I made that inquiry of the government, because I'm trying to see whether there's traction to your obvious argument about if you'd been there earlier, but it sounds like the judge, district judge, seemed to suggest that that couldn't have been the case in light of his ranking plus criminal. I mean, I'm just trying to give you the best benefit I can, because I understand your argument. I respect that you want to expand that third branch, but I just want to see how this case might be the one. I guess, Judge, Judge Walton Pratt made those observations, and yes, my client was a career offender. I can't argue that, in the end, we worked out a decent result for him, but I don't know what opportunities we missed, especially when it comes to the consecutive concurrent issue, because he ended up doing six years in Kentucky, and now he's doing ten on top, so really his sentence is sixteen, not just ten. All right. Thank you, Your Honor. All right. Thank you both, counsel. Mr. Endman, I'd like to extend a further thanks to the court for your acceptance of this appointment and ably representing Mr. Endman. Always, Judge. Thank you. The case is taken under advisory.